# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| | : | NO. 99-364-08 |
| v. | : | |
| | : | |
| | : | CIVIL ACTION |
| PEDRO JIMINEZ | : | |
| | : | NO. 05-323 |

## Memorandum and Order

YOHN, J.                                                     November ___, 2005


        Defendant Pedro Jiminez has filed a *pro se* Motion to Vacate, Set Aside, or Correct

Sentence Pursuant to Title 28 U.S.C. § 2255.  Jiminez presents several claims alleging

ineffective assistance of counsel and also argues that his sentence violates the Sixth Amendment

as interpreted by *United States v. Booker*, 125 S. Ct. 738 (2005).  For the reasons set forth below,

I will deny the motion without an evidentiary hearing.


### I. Procedural History

        On June 30, 1999, a grand jury returned a twenty-three-count indictment charging

Jiminez and seven others with conspiracy to distribute heroin, possession of heroin with intent to

distribute, and other related charges.  The indictment charged the defendant under the name

Carlos Durrder, which is one of his two aliases (the other being "Rafa").  A superseding

indictment was issued on June 14, 2000, and charged Jiminez under his true name.  The

superseding indictment charged Jiminez in seven counts, which can be summarized as follows: 1) membership in a drug organization that conspired to distribute more than one kilogram of heroin in violation of 21 U.S.C. § 846; 2) possession with intent to distribute and distribution of heroin on February 11, 1999, March 24, 1999, and May 20, 1999, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; 3) possession with intent to distribute and distribution of heroin within 1,000 feet of a playground on February 11, 1999, March 24, 1999, and May 20, 1999, in violation of 21 U.S.C. § 860 and 18 U.S.C. § 2.  The charges concerning March 24, 1999 were dismissed just prior to trial, on the government's motion.

Jiminez's trial began in this court on September 5, 2000.  On September 8, 2000, the jury returned a verdict of guilty on all counts.

On January 31, 2001, this court sentenced Jiminez to 169 months in prison, and on February 6, 2001, Jiminez filed a notice of appeal.  On motion of the defendant and the agreement of the government, the Third Circuit remanded Jiminez's case for resentencing to determine the specific quantity of drugs that could be attributed to Jiminez.  On remand, the court determined that Jiminez was responsible for distributing approximately 4,097.6 grams of heroin.  That finding corresponded with a United States Sentencing Guidelines base-offense level of 36, a two-level increase from the level I used in Jiminez's initial sentencing.  Nonetheless, in order to give Jiminez the benefit of any possible doubt and because the defendant and government did not object to the amount of heroin set forth in the presentence report at the initial sentencing (which report was placed in the record by agreement and whose factual findings were specifically adopted by the court on the record), I reimposed the initial 169-month sentence.

On May 5, 2003, Jimenez filed a second appeal, alleging that: 1) prejudicial hearsay

2

testimony was improperly admitted at his trial, and 2) the district court erred in its determination of the quantity of drugs that could be attributed to him.  On October 23, 2003, the Third Circuit found that Jiminez had waived his hearsay claim and affirmed his conviction, and ninety days later, on January 21, 2004, the decision became final.

On January 24, 2005,[1] Jiminez filed a *pro se* Motion to Vacate, Set Aside, or Correct Sentence Pursuant to Title 28 U.S.C. § 2255.  In this motion, Jimenez presents multiple claims of ineffective assistance of counsel and one claim based on the Supreme Court's decision regarding the Federal Sentencing Guidelines in *United States v. Booker*, 125 S. Ct. 738 (2005).  Jimenez alleges: 1) that appellate counsel was ineffective for failing to challenge the government's failure to correct allegedly false testimony offered by a cooperating government witness; 2) that trial and appellate counsel were ineffective for failing to challenge and rebut the government's description and use of its videotape recording of the events of February 11, 1999; 3) that appellate counsel was ineffective for failing to challenge allegedly inadmissible hearsay testimony offered at Jiminez's trial; 4) that appellate counsel was ineffective for failing to challenge hearsay evidence that was offered during a grand jury proceeding; and 5) that he is entitled to a new sentencing hearing based on the Supreme Court's decision in *Booker*.  Jiminez also seeks an evidentiary hearing in which to advance these claims.

---

[1] Jiminez signed this motion January 19, 2005.  Because a *pro se* defendant's habeas motion is considered filed on the date he delivers it to prison officials for mailing to the district court, the court adopts January 19, 2005, rather than January 24, 2005, as the filing date and finds that the motion was timely filed.  *See Burns v. Morton*, 134 F.3d 109, 113 (3d Cir. 1998).

**II. Factual History**

**A. Background Information**

Jiminez was charged with and found guilty of participating in a large-scale heroin trafficking organization that operated in the area of Second Street and Lehigh Avenue in Philadelphia. At trial, the government presented evidence in the form of testimony from seven witnesses, a videotape recording of the events of February 11, 1999, tape recordings of conversations between a confidential source and various members of the drug organization, and photographs taken during surveillance on May 20, 1999. The individuals who testified at trial were: Daniel Brown, a special agent with the Drug Enforcement Administration ("Agent Brown"); Clara, the government's confidential source who made controlled drug purchases from the organization; Domingo Duran-Mariano (who also went by the names Ramon Balanco and Brujo), an individual who sold drugs for the drug organization; Yosandy Peralta, another individual who sold drugs for the drug organization; Victor Benites, an agent of the Pennsylvania Office of the Attorney General, Bureau of Narcotics Investigation ("Agent Benites"); Andrew Maenner, a Philadelphia Police Officer ("Officer Maenner"); and Steven Hellmuth, another Philadelphia Police Officer ("Officer Hellmuth").

Agent Brown, who was in charge of the investigation, offered comprehensive testimony explaining the strategies law enforcement employed in probing the drug organization. He stated that his investigation focused on three establishments in the Second and Lehigh area, namely a restaurant, a billiards hall, and a teleporanda. (App. 108, 111). One of Agent Brown's primary sources of information was the confidential source Clara, who made contacts and bought drugs from individuals in this drug organization on Agent Brown's orders and then reported back to

4

him.  (App. 113-14).  While Clara was engaging in these operations, she was outfitted with a Kell transmitter and a micro-cassette recorder, which allowed the agents to listen to her conversations in real time and created recordings of the conversations.  (App. 116.)

While conducting these operations for the government, Clara made contact with individuals from various levels of the drug organization.  In October of 1998, during Clara's first operation in the area, she met and bought drugs from Francisco Sanchez, who was the head of the organization.  (App. 338.)  In December of 1998, Clara again met with Francisco.  (App. 341.) This time, Francisco informed Clara that he planned to visit the Dominican Republic and that while he was away she could buy drugs from his brother, Felix Sanchez.  (App. 341.)  Also in December of 1998, Clara met Duran-Mariano, a lower-level dealer who sold drugs out of the restaurant.  (App. 343.)

Both Duran-Mariano and Peralta, the latter of whom was also a local drug dealer, testified that Jiminez distributed heroin to them to sell.  (App. 239, 318.)  Duran-Mariano, from whom Clara purchased heroin on February 11, 1999 and May 20, 1999, testified that Jiminez supplied him with heroin ten or fifteen times.  (App. 243.)  Peralta testified that Jiminez supplied him with between 40 and 200 grams of heroin a week.  (App. 319.)  Duran-Mariano and Peralta both identified Jiminez in court as the man from whom they purchased heroin.  (App. 233, 316-17.)

The agents became familiar with the name "Carlos Durrder" (which was included in the first indictment) through stops conducted by Officer Hellmuth.  Officer Hellmuth testified that in early May of 1999 he stopped a man walking around the Second and Lehigh area who identified himself as Carlos Durrder and stated that he lived at 2219 Howard Street.  (App. 366-67.) Officer Hellmuth also testified that later in May of 1999 he again stopped the same man, who

provided the same personal information.  (App. 367-68.)  At Jiminez's trial, Officer Hellmuth

identified Jiminez as the man that he had stopped on those two occasions.  (App. 369.)

Jiminez was charged with and found guilty of distributing drugs based on his activities on

February 11, 1999 and May 20, 1999.  Accordingly, the evidence concerning those two dates will

be discussed in detail.

**B. February 11, 1999**

Agent Brown testified that on February 11, 1999, Clara was dispatched in the Second and

Lehigh area with instructions to purchase one ounce of heroin.  (App. 123.)  Agent Brown

conducted surveillance from a nearby vehicle.  (App. 123.)  He explained that he watched Clara

approach Duran-Mariano, and that Clara eventually returned with one ounce of heroin.  (App.

123.)

Duran-Mariano also testified about the February 11 transaction.  He testified that the

events of February 11 transpired as follows: Clara approached him and asked to purchase heroin.

(App. 238.)  Duran-Mariano then beeped Jiminez (whom he knew as Rafa), and asked Jiminez to

supply him with heroin to sell to Clara.  (App. 239-40.)  Jiminez agreed, and delivered the heroin

to Duran-Mariano "a little bit further from the restaurant."  (App. 240.)  After Duran-Mariano

obtained the heroin from Jiminez, he and Clara went into the restaurant's bathroom and

completed the transaction.  (App. 240.)  Duran-Mariano kept five percent of the proceeds and

paid the rest to Jiminez.  (App. 240.)

Clara also testified about the February 11, 1999 transaction, providing the following

account of her role: She walked into the restaurant and was followed immediately by Duran-

Mariano.  (App. 345.)  Once inside, she asked Duran-Mariano for one ounce of heroin, and he

6

told her to wait for a moment.  (App. 345.)  She waited outside the restaurant and talked with two

other men for a short time, and then Duran-Mariano joined the group.  (App. 345-46.)  Then

Duran-Mariano and Clara walked into the billiards hall.  (App. 346.)  Inside, Duran-Mariano

asked several people to leave, so that the two of them could make the heroin deal in privacy.

(App. 346.)  After she received the drugs she left the hall, and eventually relayed the drugs to

Agent Brown.  (App. 346.)  She testified on cross-examination that she could not recall whether

she saw Jiminez at any time during this transaction.  (App. 357-58.)

An agent, while located inside a city building about two blocks from the Second and

Lehigh locations, recorded the outdoor portion of the February 11, 1999 events with an eight-

millimeter hand-held camera.  (App. 172.)  Agent Brown testified that the agent was not able to

film the entire transaction, because the city required the agents to leave the building at promptly

4:00 p.m.  (App. 172.)  The prosecutor stated that there was no sound to the tape.  (App.  171.)

The government played this video for the jury (App. 171-76), with Agent Brown narrating as

follows: First Clara and then Duran-Mariano walked into the restaurant.  (App. 173.)  Soon,

Clara returned to the street, where she talked to another drug dealer.  (App. 174.)  Eventually the

two were joined by Duran-Mariano, who came from the area of the billiards hall.  (App. 175.)

Then Duran-Mariano walked back into the billiards hall, and then returned to the street.  (App.

175.)  Next, all three individuals walked a short way down the street.  (App. 175.)  Finally,

Duran-Mariano made two more trips back and forth from Clara to the billiards hall.  (App. 176.)

At that point the tape shown at trial came to an end, after twenty-one minutes.  (App. 176.)

However, it seems that the tape actually includes an additional six minutes that were not shown

at trial.  Brown testified that Jiminez did not appear in the video (App. 178); Jiminez also does

not appear in the extra six minutes.

## C. May 20, 1999

On May 20, 1999, Agent Brown again dispatched Clara to purchase heroin from Duran-Mariano. (App. 131.) He explained that he and Agent Benites conducted surveillance from a minivan (App. 132-33), and that he used DEA-issued binoculars as often as practicable (App. 133). Agent Brown testified to witnessing the following: First, Clara met Duran-Mariano, and then walked into the restaurant with him. (App. 134.) Next, Duran-Mariano left the restaurant and entered the teleporanda, while Clara remained in the restaurant. (App. 134.) Then, after leaving the teleporanda, Duran-Mariano met with three males, one of whom Agent Brown later identified as Jiminez. (App. 135.) Jiminez was wearing a black baseball hat, a white t-shirt, blue jeans, and a large gold necklace with a medallion. (App. 135.) After speaking with the other men, Jiminez walked away, out of Agent Brown's sight. (App. 135-37.) Then, about ten minutes later, Jiminez reappeared, walking back toward the restaurant. (App. 142.) This time, Jiminez appeared to be carrying a clear plastic baggie in his left hand. (App. 142.) Jiminez looked into the restaurant and the teleporanda, and then entered the restaurant. (App. 145.) Approximately two minutes after Jiminez entered the restaurant, Clara exited. Jiminez then stepped out of the restaurant and watched Clara walk away. (App. 147.) Agent Brown further testified that soon after the transaction he met with Clara, and she turned over the two ounces of heroin that she had purchased. (App. 148.) Brown explained that he and Clara then drove around for a short time, and eventually passed the area where the transaction occurred. (App. 153.) At this point, Clara saw Jiminez on the street and identified him as an individual who was involved in the heroin deal. (App. 153.)

8

Agent Benites, who was conducting surveillance in the van with Agent Brown (App. 262-63), provided testimony similar to that of Agent Brown.  Agent Benites testified that he watched Jiminez and Duran-Mariano speak, and then watched Jiminez walk away.  (App. 264.)  He then saw Jiminez return, with a white object in his left hand, and enter the restaurant.  (App. 265-66.) Soon afterward Clara, Jiminez, and Duran-Mariano each individually left the restaurant.  (App. 266.)  In court, Agent Benites identified Jiminez as the man that he saw carrying the white object. (App. 265.)

Duran-Mariano also testified about the May 20, 1999 transaction.  He explained that the events occurred as follows: Clara approached him and asked for two ounces of heroin.  (App. 241.)  Then, almost immediately thereafter, he saw Jiminez exit the teleporanda.  (App. 241.) Duran-Mariano then approached Jiminez and told him that he needed some heroin to sell to Clara.  (App. 241.)  Jiminez promised to supply Duran-Mariano with the heroin, and walked away.  (App. 241.)  Soon afterward, Jiminez returned and gave Duran-Mariano the heroin in a white napkin, just inside the restaurant.  (App. 242.)  Duran-Mariano then sold the heroin to Clara, and provided Jiminez with his share of the money inside the teleporanda.  (App. 242-43.)

Clara also testified that she purchased two ounces of heroin from Duran-Mariano on May 20, 1999.  She explained that she was waiting in the restaurant until Jiminez arrived.  (App. 350-51.)  She stated that he was wearing a black hat, a white shirt, blue pants, and a medallion, and that he gave drugs to Duran Mariano inside a white bag.  (App. 351.)  She later amended this to say that the bag was transparent.  (App. 352).  In court, Clara identified Jiminez as the man who delivered the drugs.  (App. 351-52.)

Officer Maener testified about the events of May 20, 1999 as follows: He was conducting

9

surveillance, and saw a man wearing a black hat, a white T-shirt, blue jeans, and a gold medallion necklace walk down Hancock Street and enter a residence.  (App. 303-04.)  Officer Maener was unable to ascertain which house the individual entered, so he repositioned himself and waited for the individual to leave.  (App. 304.)  Eventually, he saw the same individual exit 2634 Hancock Street.  (App. 304-05.)  Officer Maener later saw the same individual standing on the street with Clara.  (App. 305.)

Another agent took several photographs of Jiminez and Clara on this day, which captured Jiminez's various perambulations.  (App. 138-48.)  The pictures, however, do not show Jiminez's left hand, so neither support nor contradict Agent Brown's testimony that Jiminez was carrying heroin as he walked from his house to the restaurant.  (App. 143-44.)

**D. The Arrest**

On June 1, 1999, five search warrants were executed at five locations: the restaurant, the billiards hall, the teleporanda, 2634 North Hancock Street, and 2219 North Howard Street.  (App. 167-68.)  No heroin was found in any of the locations.  (App. 170.)  Peralta and Duran-Mariano were arrested (App. 229, 320), while an arrest warrant for "Carlos Durrder" went unexecuted. (App. 169.)

When the search was conducted at 2634 North Hancock Street, Jiminez was present and provided his real name and identification in that name.  (App. 213.)  Investigators did not realize that Jiminez was part of the drug ring until other members of the drug organization began mentioning the name "Rafa" to them.  (App. 375.)  Agents then determined that Rafa was an alias of Pedro Jiminez, and linked Jiminez to 2634 North Hancock Street.  (App. 377.)  Jiminez was arrested on February 23, 2000, and admitted that he was known as Rafa.  (App. 170-71,

378.)

### III. Legal Standards

### A. 28 U.S.C. § 2255 Standards

28 U.S.C. § 2255 permits a federal prisoner to move the sentencing court to vacate, set aside, or correct his sentence if "the sentence was imposed in violation of the Constitution or laws of the United States, . . . the court was without jurisdiction to impose [the] sentence, . . . the sentence was in excess of the maximum authorized by law, or [the sentence] is otherwise subject to collateral attack."  When a prisoner files a § 2255 motion, the district court may dismiss the motion without an evidentiary hearing if "the motion and files and records of the case show conclusively that the movant is not entitled to relief."  *Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989) (citation omitted).  In making this determination, "the court must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record."  *Id.*

"A Section 2255 petition is not a substitute for an appeal."  *Gov't of the Virgin Islands v. Nicholas*, 759 F.2d 1073, 1074-75 (3d Cir. 1985) (citation omitted).  However, defendants need not raise ineffective assistance of counsel claims on direct appeal.  *United States v. DeRewal*, 10 F.3d 100, 103-04 (3d Cir. 1993); *see also United States v. Nahodil*, 36 F.3d 323, 326 (3d Cir. 1994) ("A § 2255 motion is a proper and indeed the preferred vehicle for a federal prisoner to allege ineffective assistance of counsel.").

### B. Ineffective Assistance of Counsel

To establish ineffective assistance of counsel, a defendant must show that: 1) his

attorney's performance was deficient, and 2) the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show deficiency, a defendant must establish that counsel's performance "fell below an objective standard of reasonableness under prevailing professional norms." *Buehl v. Vaughn*, 166 F.3d 163, 169 (3d Cir. 1999) (citing *Strickland*, 466 U.S. at 688). To show prejudice, a defendant must establish that "counsel's errors were so serious as to deprive him of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding," *id.* at 694, rather "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 695. Under *Strickland*, counsel is presumed to have acted within the range of "reasonable professional assistance," and the defendant bears the burden of "overcoming the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (citation omitted).

While a defendant has the right to effective assistance of counsel, courts have explained that the Constitution does not guarantee the right to a perfect trial. *See Marshall v. Hendricks*, 307 F.3d 36, 85 (3d Cir. 2002) (noting that "the court is not engaging in a prophylactic exercise to guarantee each defendant a perfect trial with optimally proficient counsel, but rather to guarantee each defendant a fair trial, with constitutionally competent counsel").

## IV. Discussion

In his Motion to Vacate, Set Aside, or Correct Sentence Pursuant to Title 28 U.S.C. § 2255, Jiminez challenges his conviction in several ways. He argues that he suffered from

ineffective assistance of counsel because: 1) his appellate counsel failed to challenge the government's failure to correct what Jiminez alleges was Duran-Mariano's perjurious testimony; 2) both his trial and appellate counsel failed to challenge and rebut alleged prosecutorial misconduct regarding the February 11, 1999 videotape; 3) his appellate counsel failed to challenge what Jiminez alleges was hearsay testimony proffered at his trial; and 4) his appellate counsel failed to challenge the government's use of hearsay testimony at Jiminez's grand jury proceeding.  He also argues that his sentence violates the Sixth Amendment as interpreted by *United States v. Booker*, 125 S. Ct. 738 (2005).  Additionally, Jiminez seeks an evidentiary hearing in which to advance these claims.  However, because the record conclusively shows that Jiminez's ineffective assistance of counsel claims are without merit, even accepting the truth of defendant's factual allegations, I will deny all of those claims without an evidentiary hearing. Additionally, I will deny Jiminez's *Booker* claim because that case is not retroactively applicable on collateral review.

## A. Ineffective Assistance of Counsel Claims

### 1. Allegations of Perjury

Jiminez first argues that his appellate counsel was ineffective because he failed to challenge the government's failure to correct Duran-Mariano's testimony that he had not been promised a downward departure to his sentence under Section 5K1 of the United States Sentencing Guidelines.  (Def.'s Habeas Motion 6.)  Jiminez argues that the government had previously informed the court that it had promised to file a 5K1 motion for Duran-Mariano, and that Duran-Mariano's testimony denying the existence of such an agreement was perjurious. However, because the record does not support the defendant's claim that the government actually

made such a promise, this claim will be denied.

Duran-Mariano testified at trial that he had not been promised any reduction to his sentence in exchange for his testimony in Jiminez's case. (App. 232-33.) While Jiminez alleges that the government had made such a promise, the record does not support this allegation. The only time that a 5K1 was adverted to was before trial, in a discussion about whether the government's documents contained evidence that could be used to impeach its witnesses. (App. 22.) At that point I asked if the government's witnesses (one of whom was Duran-Mariano) were seeking 5K1s, and the government answered in the affirmative. (App. 22.) The word "seeking" shows that the witnesses hoped to receive a downward departure sometime in the future, not that they had already received the departure (or a definite promise thereof). Thus, since there was no evidence that Duran-Mariano's testimony at trial on this issue was false, there was nothing for Jiminez's attorney to challenge and he was not deficient. As the Third Circuit has explained, "counsel cannot be deemed ineffective for failing to raise a meritless claim." *Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000) (citation omitted).

Additionally, the timing of Duran-Mariano's and Jiminez's cases supports Duran-Mariano's testimony. The docket shows that Duran-Mariano entered his initial guilty plea on October 26, 1999; however, the record in his case shows that he entered an open plea and did not have a plea agreement with the government. Then, Jiminez's trial began on September 5, 2000. Finally, on May 2, 2001, well after the conclusion of Jiminez's trial, the government filed a 5K1 motion authorizing a downward departure to Duran-Mariano's sentence. Thus, the timeline is consistent with Duran-Mariano's testimony: he had not received any formal promise from the government before he testified against Jiminez, but eight months later the government did file a

14

5K1 motion in his behalf.  The procedure is also in accord with the standard practice of the government in this district which the court has observed for fourteen years. The defendant has proffered no evidence to the contrary.  Accordingly, the record conclusively shows that this claim is without merit, and I will deny it without an evidentiary hearing.

**2. Allegations of Prosecutorial Misconduct Regarding its Use of the Videotape**

Jiminez also argues that both his trial and appellate counsel were ineffective based on their failure to challenge the government's incorrect assertions that the February 11, 1999 videotape lasted twenty-one minutes, contained no sound, and ended before the drug transaction was completed because the filming agents were required to vacate the building by 4:00 p.m. (Def.'s Habeas Motion 12.)  Jiminez also argues that his trial counsel was ineffective because he failed to properly investigate this video, which rendered him unprepared to object to the government's mischaracterizations.  (Def.'s Habeas Motion 19-20.)  However, because the record conclusively shows that the government's faulty description of the video did not prejudice Jiminez, I will deny all of his ineffective assistance of counsel claims that concern this video without an evidentiary hearing.

Jiminez correctly notes that the government's description of the video at his trial was not completely accurate.  First of all, Agent Brown's testimony that the video was only twenty-one minutes long was erroneous; the video is actually twenty-seven minutes in length.  The additional six minutes begin after a short gap where it appears that the video has stopped.  Also, the prosecutor stated that the video did not have sound.  That is also incorrect, but only technically: the video did not record any of the street-level sounds, but did record the comments made by the agents who were filming from inside the city building.  Finally, Jiminez contests Agent Brown's

testimony that the video ended before the entire drug transaction was completed because the agents had to vacate the city building by 4:00 p.m.

While Jiminez is correct in identifying these inconsistencies, he is only entitled to relief if he can show that his attorneys' failure to challenge the inconsistencies prejudiced his defense. *See Strickland*, 466 U.S. 668, 687.  The fact that the video was shown without sound did not result in prejudice; the comments made by the agents were inadmissible hearsay, so would not have impacted Jiminez's trial in any way.  Moreover, Jiminez has not suggested that any of the comments by the agents, which he has now heard, would have helped him in any way.  Thus, Jiminez can only prevail on this claim if he can show that he was harmed by the fact that six minutes of the video were not shown to the jury.  The government argues that Jiminez could not have been prejudiced by this omission, partly because the videotape itself was only tangentially related to Jiminez.  The government contends that it showed this video merely to corroborate Clara's testimony that she made contact with Duran-Mariano on February 11, 1999.  (Govt.'s Response 36.)  Nevertheless, Jiminez argues that the fact that the entire film was not shown harmed him in several ways.

First, Jiminez argues that the video contradicted the testimony of Agent Brown and Clara that Jiminez was present during the drug transaction on February 11, 1999.  (Def.'s Habeas Motion 12.)  However, Agent Brown never did testify that he saw Jiminez on February 11, 1999 and was forthright in testifying that Jiminez never appeared on the video.  (App. 78.)  Further, Clara testified that she could not recall whether she had seen Jiminez during the transaction. (App. 357-58.)  The video does not contradict even this equivocal testimony.  While it is true that Jiminez is not shown on the video, either in the original twenty-one minutes or the additional six,

16

the video only shows the activities that occurred outdoors. It is entirely possible that Clara did see Jiminez inside the restaurant. In any case, during trial there was no dispute as to whether Jiminez was portrayed in the video; all parties agreed that he was not. Therefore, the government's failure to show the last six minutes of the video did not prejudice Jiminez in this respect.

Jiminez also argues that the fact that the final part of the video was not shown prejudiced him because it obfuscated the discrepancy between the video, in which Jiminez never appeared, and Duran-Mariano's testimony, in which Duran-Mariano stated that Jiminez provided him with heroin "a little bit further from the restaurant." (Def.'s Traverse 8-10.) This claim must fail for two reasons. First of all, it appears that Jiminez raised this claim for the first time in his traverse: while his original motion contests the government's description of the video as lacking sound and spanning only twenty-one minutes, it never mentions Duran-Mariano's testimony on this matter. Some courts have refused to allow an individual to assert new claims in a traverse. *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) ("A Traverse is not the proper pleading to raise additional grounds for relief."); *United States v. Stevens*, 2005 WL 1875666, at *1 (W.D. Wis. Aug 5, 2005) ("Raising new claims in a traverse is improper because it does not provide the government an opportunity to be heard on the claims."). Nonetheless, even if I were to liberally construe Jiminez's original motion and find that this claim was raised in that filing (and that it was not precluded by the statute of limitations), *see Lewis v. Attorney Gen. of the U.S.*, 878 F.2d 714, 722 (3d Cir. 1989) (explaining that "a pro se prisoner's pleadings should be .

. . construed liberally"), it would still fail on its merits.[2]

The claim fails on the merits because, while Jiminez has identified an apparent inconsistency between the video and Duran-Mariano's testimony, he has not shown that playing the additional six minutes of the video would have helped his case. Agent Brown plainly admitted that Jiminez did not appear on the tape; he did not hedge or claim that Jiminez appeared on the street sometime after the video ended. Thus, the jury was free to consider this inconsistency already; Jiminez does not claim that the additional six minutes show anything different than the first twenty-one. In sum, Jiminez does not allege that there is anything

---

[2] Jiminez also raises a second claim, for the first time, in his traverse, alleging that his counsel failed to conduct a "meaningful cross-examination of Duran-Mariano," regarding the events of February 11, 1999. (Def.'s Traverse 17.) However, even if the court does consider the merits of this claim, it must also fail.

Jiminez argues that his lawyer's cross-examination of Duran-Mariano was deficient because he did not ask questions specifically concerning February 11, 1999. He argues that his counsel should have impeached Duran-Mariano through the use of Agent Brown's grand jury testimony, in which Agent Brown did not mention that Jiminez was involved in the February 11 drug transaction. (Def.'s Traverse 17.) It is not clear how this mode of impeachment would have made any difference in Jiminez's trial. The grand jury testimony is not a prior inconsistent statement of Duran-Mariano, because Duran-Mariano did not make the statement. Additionally, it is insufficiently definite to be compelling contradictory evidence: just because Agent Brown did not testify about Jiminez's activities on February 11, 1999 does not mean that Duran-Mariano did not see him on that date.

Additionally, Jiminez's trial counsel did cross-examine Duran-Mariano on several other points. For example, Jiminez's counsel questioned Duran-Mariano about his use of false names to "elude the law" (App. 244), his habit of lying to police (App. 244), his history as a drug dealer (App. 245), the fact that he was testifying in an attempt to procure a lesser sentence for his drug conviction (App. 248), his flawed memory of the dates and details of alleged drug transactions besides those at issue in Jiminez's case (App. 249), and the large number of times that he had met with the government to discuss his testimony for Jiminez's case (App. 249). In his closing statement, Jiminez's counsel went so far as to call Duran-Mariano a "rat" (App. 423), stated definitively that Jiminez was not shown in the February 11, 1999 video (App. 439), highlighted the fact that Duran-Mariano described Jiminez as carrying heroin in a napkin while Clara described the heroin as being in a plastic bag (App. 439), and argued that Duran-Mariano had spent extensive time practicing his statement with the government (App. 439). Overall, this cross-examination was proficient. Thus, I will also deny this claim.

exculpatory in the additional six minutes of film, and Jiminez's argument about the video's impeachment value is based entirely on his own speculation.  Jiminez's arguments conclusively fail to show that there is a "reasonable probability" that had the jury seen the additional six minutes of film, the "result of the proceeding would have been different."  *Strickland*, 466 U.S. 695.  Thus, Jiminez fails to show that he was prejudiced by the fact that the final portion of the video was not played for the jury.

This reasoning also applies to Jiminez's argument that his trial counsel failed to adequately investigate the government's evidence, which failure prevented the lawyer from recognizing and challenging the government's mischaracterization of the video.  (Def.'s Habeas Motion 19.)  While a lawyer does have the duty to conduct an appropriate investigation, *see id.* at 691 (stating "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"), the failure to do so will not alone make out an ineffective assistance of counsel claim.  The individual must also show that the lawyer's failure to conduct a proper investigation resulted in prejudice.  *Id.* at 687.  Here, Jiminez was not prejudiced by the fact that the additional six minutes of video were not shown to the jury, as discussed above.  Thus, even if his lawyer were deficient in failing to investigate, Jiminez still has not shown that he suffered from an ineffective assistance of counsel.  Additionally, insofar as Jiminez attempts portray his trial counsel as unprepared and inactive in his defense, the court notes that a review of the docket shows that Jiminez's lawyer filed the following documents before trial: Motion for Disclosure of Exculpatory Evidence, Motion for Disclosure Pursuant to Jencks Act, Motion for Disclosure of Rule 404(b) Material, Motion to Strike Aliases, Motion in Limine to Preclude Introduction at Trial of Any Acts or Materials Outside the Alleged

19

Conspiracy, Answer to Government's Motion to Preclude Alibi Evidence, and Answer to Government's Motion to Admit English Translation Transcripts of Spanish Language Tapes. Accordingly, Jiminez's ineffective assistance of counsel claim alleging that his counsel failed to investigate the government's evidence will also fail.

Thus, because the record conclusively shows that Jiminez was not prejudiced by the fact that the final portion of the video and the video's sound were not played at trial, I will deny his ineffective assistance of counsel claims concerning the video without an evidentiary hearing.

### 3. Hearsay Allegations

Jiminez argues that his appellate counsel was ineffective for failing to challenge what he alleges to be hearsay testimony proffered by Agent Brown at trial.  (Def.'s Habeas Motion 13.) Jiminez identifies three of Agent Brown's statements that he argues that his lawyer should have challenged.  However, the first statement was not hearsay; I sustained his lawyer's objection to the second statement; and while Jiminez correctly identifies the third statement as inadmissible hearsay, its admission did not prejudice Jiminez.  Therefore, I find that the record conclusively shows that these hearsay arguments are without merit, and I will deny this claim without an evidentiary hearing.

Jiminez first alleges that Agent Brown presented inadmissible hearsay testimony when he stated that on May 20, 1999, while conducting surveillance, he observed Jiminez "carrying what appeared to be two ounces of heroin."  (Def.'s Habeas Motion 15.)  However, hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  Here, there was no statement; Agent Brown simply offered his own observations and perceptions.  Thus, since a

hearsay objection would have been overruled, Jiminez's counsel was not ineffective for failing to make one.

Second, Jiminez challenges Agent Brown's testimony that: "[2219 Howard Street] was an address that Domingo-Mariano had previously given us on two stops.  It was also the address that Carlos Durrder at the time, gave us on two separate occasions."  (Def.'s Habeas Motion 15.) However, as Jiminez acknowledges (Def.'s Habeas Motion 15), his counsel objected to this testimony, and I sustained the objection.  (App. 168-69.)  As I explained to the jury at the start of the trial:

> [W]hat sometimes does happen is that before the attorney can object to a question or before I can rule on the objection, the witness goes ahead and answers the question. If that should happen and I sustain the objection, meaning there should not have been an answer, then you ignore the answer and do not consider it in your deliberations, because it should not have been given.

(App. 85.)  Those instructions specifically governed this situation.  Because I sustained Jiminez's counsel's objection to Agent Brown's statement about Howard Street, the statement was not admitted into evidence.  Thus, Jiminez's counsel was not deficient on this matter; rather, he diligently objected to inappropriate testimony.

Finally, Jiminez challenges his counsel's failure to object to Agent Brown's statement that Duran-Mariano, Peralta, Officer Hellmuth, and Clara had all identified Jiminez as a participant in the drug organization.  (Def.'s Habeas Motion 16.)  While Jiminez is correct that this testimony was hearsay, it was not prejudicial to his case.  Each of the four individuals whose statements Agent Brown repeated also testified on his/her own and identified and implicated Jiminez in that testimony.  (App. 241, 317, 369, 351-52.)  Thus, Agent Brown's statement was merely cumulative of the preceding testimony and not prejudicial to Jiminez.  *See United States*

21

*v. Serafini*, 233 F.3d 758, 770 (3d Cir. 2000) (finding that because improperly admitted hearsay evidence was almost wholly cumulative of other, properly admitted evidence, any error in admitting the hearsay evidence was harmless).  Accordingly, this claim for ineffective assistance of counsel will also be denied.

### 4. Allegations of Hearsay Testimony in a Grand Jury Proceeding

Jiminez also argues that his appellate counsel was ineffective because he failed to challenge the government's use of hearsay testimony in the grand jury proceeding.  (Def.'s Habeas Motion 17.)  Specifically, he contests the fact that Agent Brown and Officer Nowetner were permitted to present the statements of government witnesses to the grand jury.  However, it does not appear that hearsay testimony is actually prohibited in grand jury proceedings.  Additionally, even if hearsay testimony were prohibited, Jiminez has failed to show that had the grand jury heard the eyewitness testimony, it would not have indicted.  Accordingly, this claim will be denied.

In an early case ruling on the federal courts' relationship with grand juries, the Supreme Court refused to enforce the hearsay rule in grand jury proceedings, finding that it "would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules."  *Costello v. United States*, 350 U.S. 359, 364 (1956).  However, the Second Circuit subsequently limited *Costello*'s expansive rule in an effort to combat the "casual attitude with respect to the presentation of evidence to a grand jury."  *United States v. Estepa*, 471 F.2d 1132, 1135 (2d Cir. 1972).  The court held that "the grand jury must not be misled into thinking it is getting eye-witness testimony from the agent whereas it is actually being given an account whose hearsay nature is concealed."  *Id.* at 1136.  The Third Circuit

tentatively incorporated *Estepa*, creating the following rule:

> (A)n indictment based on hearsay is invalid where (1) non-hearsay evidence is readily available; (2) the grand jury is misled into believing it was hearing direct testimony rather than hearsay; and (3) there is high probability that had the grand jury heard the eye witness it would not have indicted.

*United States v. Wander*, 601 F.2d 1251, 1260 (3d Cir. 1979).  *See also United States v. Ismaili*, 828 F.2d 153, 164 (3d Cir. 1987) (applying same rule).

However, the Supreme Court's subsequent decision in *United States v. Williams*, 504 U.S. 36 (1992), has cast doubt on the continuing validity of the *Estepa* line of cases.  *Williams* held that a district court may not dismiss an otherwise valid indictment because the government failed to disclose to the grand jury exculpatory evidence that was in its possession.  *Id.* at 47.  In reaching this conclusion, the Court cautioned that "[b]ecause the grand jury is an institution separate from the courts, over whose functioning the courts do not preside," no general "'supervisory' judicial authority exists" over grand jury proceedings.  *Id.  Williams* also noted that "over the years, we have received many requests to exercise supervision over the grand jury's evidence-taking process, but we have refused them all."  *Id.*  It further explained that:

> [W]e reaffirmed [a principle of *Costello*] recently in *Bank of Nova Scotia*, where we held that "the mere fact that evidence itself is unreliable is not sufficient to require a dismissal of the indictment," and that "a challenge to the reliability or competence of the evidence presented to the grand jury" will not be heard.  487 U.S. at 261.  It would make little sense, we think, to abstain from reviewing the evidentiary support for the grand jury's judgment while scrutinizing the sufficiency of the prosecutor's presentation.  A complaint about the quality or adequacy of the evidence can always be recast as a complaint that the prosecutor's presentation was "incomplete" or "misleading."

*Id.* at 54 (footnote omitted).  The Court offered *Estepa* as an example of a case where a challenge to the quality of the evidence was styled as a challenge to the prosecutor's presentation.  *Id.* at 54

23

n.8.  Thus, while *Williams* did not explicitly overrule *Estepa* (and *Wander*), it did seem to reject

the logic of those cases and reiterate *Costello*'s holding that it is inappropriate for the federal

courts to scrutinize the grand jury's evidentiary process, including its use of hearsay evidence.

Thus, Jiminez's argument that his counsel was ineffective for failing to challenge the use of

hearsay testimony during the grand jury proceeding must fail because hearsay testimony is an

acceptable form of evidence in such proceedings.

Even if the test from *Wander* were to survive *Williams*, Jiminez is unable to satisfy its

third prong.  That prong requires the defendant to show that "there is high probability that had the

grand jury heard the eye witness it would not have indicted."  *Wander*, 601 F.2d at 1260.  Here,

Jiminez has not presented any evidence indicating that the result of his grand jury proceeding

would have been different had the cooperating witnesses themselves testified instead of Agent

Brown and Officer Nowetner.  In describing Agent Brown's and Officer Nowetner's recitation of

the witnesses' testimony, Jiminez uses the word "regurgitated" (Def.'s Traverse 12), which

intimates that the law enforcement agents' statements were entirely consistent with what the

witnesses would have said.  Additionally, Jiminez does not argue that there was a vast difference

in credibility between the agents and their witnesses, or advance any other reason that the fact

that the agents testified instead of the witnesses was of consequence.  Thus, this claim will also

be denied without an evidentiary hearing.

**B. *Booker* Claim**

Jiminez argues that his Sixth Amendment right to a jury trial, as interpreted by *United

States v. Booker*, 125 S. Ct. 738 (2005), was violated when this court, rather than a jury, made the

determination of the quantity of drugs that he was responsible for distributing.  However, because

*Booker* is not retroactively applicable on collateral review, its rule is not available to Jiminez in this habeas proceeding.[3]

In *United States v. Booker*, 125 S. Ct. 738, 746 (2005), the Supreme Court held that "the Sixth Amendment as construed in *Blakely* does apply to the [Federal] Sentencing Guidelines." *Blakely v. Washington*, 542 U.S. 296 (2004), which the Supreme Court decided less than a year before *Booker*, held that the State of Washington's sentencing scheme, which allowed judges to impose sentences based partly on facts neither found by a jury nor admitted by the defendant, violated the Sixth Amendment right to a jury trial. Thus, Jiminez argues that because this court, rather than a jury, determined that he was responsible for distributing 4,097.6 grams of heroin, his Sixth Amendment rights were violated.

However, in *Lloyd v. United States*, 407 F.3d 608 (3d Cir. 2005), the Third Circuit concluded that the rule in *Booker* is not retroactively applicable to cases on collateral review. The court held "[b]ecause *Booker* announced a rule that is 'new' and 'procedural,' but not 'watershed,' *Booker* does not apply retroactively to initial motions under § 2255 where the judgment was final as of January 12, 2005, the date *Booker* issued." *Id.* at 615-16. Here, Jiminez's conviction became final on January 21, 2004, almost a year before the Supreme Court

---

[3] Additionally, Jiminez's attorney was not ineffective in failing to raise this claim on appeal. *Apprendi v. New Jersey*, 530 U.S. 466 (2000), was decided in 2000, prior to the final disposition of Jiminez's direct appeal on October 23, 2003, when the circuit court affirmed, and ninety days thereafter (January 21, 2004), when the time for seeking certiorari expired. However, there was no ineffectiveness with reference to *Apprendi* because that case was universally held by courts of appeals not to apply to the Federal Sentencing Guidelines, *see, e.g., United States v. Parmelee*, 319 F.3d 583, 592 (3d Cir. 2003), until the possibility arose on June 24, 2004 with the *Blakely* decision, after Jiminez's conviction became final. Therefore, there is no ineffectiveness in failing to raise an *Apprendi* issue because counsel's performance was not deficient during the sentencing hearing and on direct appeal.

issued *Booker*.  Thus, because *Booker* is not retroactively applicable to Jiminez's case, this claim will be denied.

## C. Certificate of Appealability

Finally, the court must determine whether a certificate of appealability should issue.  The court may issue a certificate of appealability only if the defendant "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This requires that the defendant "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, the court has determined that Jiminez's various ineffective assistance of counsel claims and his *Booker* claim are without merit.  The court is persuaded that reasonable jurists would not find this assessment debatable or wrong.  Therefore, Jiminez has failed to make a substantial showing of the denial of a constitutional right, and a certificate of appealability will not issue.

An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
|  | : |  |
|  | : | NO. 99-364-08 |
| v. | : |  |
|  | : |  |
|  | : | CIVIL ACTION |
| PEDRO JIMINEZ | : |  |
|  | : | NO. 05-323 |

## Order

Yohn, J.


AND NOW on this _____ day of November 2005, upon consideration of defendant Pedro Jiminez's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to Title 28 U.S.C. § 2255 (Doc. No. 289), the government's response thereto, and the defendant's traverse, it is hereby ORDERED that:

1.   The defendant's motion is DENIED.

2.   The defendant having failed to make a substantial showing of the denial of a constitutional right, there is no ground to issue a certificate of appealability.

3.   The Clerk shall mark this case CLOSED for statistical purposes.


_____
William H. Yohn, Jr., Judge